IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

STEVEN D. STEWART,

                        Plaintiff,

   v.

DR. BURTON COX, JR., H.S.U. MARY MILLER,
NURSE JOLINDA WATERMAN,
NURSE SHERYL KINYON, DR. DALIA SULIENE,
DR. BRAD MARTIN, DR. KARL HOFFMANN,
H.S.U. MANAGER KAREN ANDERSON,                    OPINION & ORDER
NURSE NATALIE NEWMAN,
NURSE TRISHA ANDERSON,                                  14-cv-665-jdp
NURSE KIM CAMPBELL,
NURSE MELISSA THORNE,
NURSE ROSE DRAFAHL,
ANN PETERS-ANDERSON,
NURSE PHILLIP KERCH,
NURSE DAVID SPANNAGEL, and
SGT. RICHARD MATTI,

                        Defendants.

---

    Pro se prisoner Steven Stewart is challenging the medical treatment that he has received while in prison. I granted plaintiff leave to proceed with claims under the First and Eighth Amendments, and with state law claims for medical malpractice.

    Plaintiff suffers from a neurogenic bladder condition that makes it difficult for him to urinate without a catheter. At different times over the last 10 years or so, plaintiff has either worn an indwelling catheter or inserted a single-use "straight" catheter every few hours each day. All of plaintiff's claims in this case essentially involve variations on a central theme: plaintiff wants to receive narcotics each time that he catheterizes himself (or changes his indwelling catheter), and he wants to catheterize himself privately, in his cell. Since 2005, plaintiff has aggressively asserted these wishes, and medical personnel have generally

accommodated him. But when things have not gone plaintiff's way, he has become agitated and has refused to cooperate. He perceived these changes in routine to be retaliatory or below the standard of medical care that he was entitled to receive. Thus, plaintiff filed suit alleging that defendants violated his constitutional rights.

After a series of discovery disputes and a round of summary judgment motions based on plaintiff's failure to exhaust his administrative remedies, we have finally arrived at the merits of plaintiff's claims. All defendants move for summary judgment, contending that the undisputed facts of the case entitle them to judgment as a matter of law. For reasons explained in this opinion, I will grant these motions and dismiss this case.

## UNDISPUTED FACTS

Plaintiff disagrees with many of the facts that defendants have proposed in support of their motions for summary judgment. But for some of plaintiff's disputes, he does not cite to admissible evidence that actually contradicts the proposed fact. For other disputes, plaintiff does not respond to the proposed fact, instead discussing other issues and other evidence. As the preliminary pretrial conference order indicated, "[i]f a party's response to any proposed fact does not comply with the court's procedures or cites evidence that is not admissible, the court will take the opposing party's factual statement as true and undisputed." Dkt. 40, at 17. Thus, unless plaintiff has properly disputed a proposed finding of fact, I will accept defendants' proposed facts as true. Except where noted, the following facts are undisputed.

Plaintiff is an inmate in the custody of the Wisconsin Department of Corrections (DOC). The relevant events in this case occurred between 2005 and 2014. During some of this time, plaintiff was incarcerated at the Wisconsin Secure Program Facility (WSPF),

located in Bascobel, Wisconsin, and during the rest of the time, he was incarcerated at the Columbia Correctional Institution (CCI), located in Portage, Wisconsin. Defendants are medical personnel who worked at WSPF or CCI and interacted with plaintiff. I will generally refer to individual defendants by their titles and last names. But for organizational purposes, I will sometimes refer to the defendants who were employed by the DOC as "the state defendants." This group includes:

- Dr. Burton Cox, a physician at WSPF;

- Mary Miller, the manager of the Health Services Unit (HSU) at WSPF;

- Jolinda Waterman and Sheryl Kinyon, nurses at WSPF;

- Richard Matti, a correctional officer at WSPF.

- Dr. Dalia Suliene and Dr. Karl Hoffmann, physicians at CCI;

- Karen Anderson, the manager of the HSU at CCI;

- Kim Campbell, Natalie Newman, Melissa Thorne, Phillip Kerch, David Spannagel, and Trisha Anderson, nurses at CCI; and

- Dr. Brad Martin, a physician at a different DOC facility who filled in at CCI.

The remaining defendants were independent contractors:

- Rose Drafahl is a licensed practical nurse who was assigned to work at CCI from August 20, 2012, to August 3, 2015; and

- Ann Peters-Anderson is a registered nurse who was assigned to work at CCI from April 21, 2014, to October 31, 2014.

In August 2005, doctors at the University of Wisconsin Hospital examined plaintiff and discussed an ongoing issue that he had been having with his bladder. In a letter summarizing the examination, doctors informed WSPF medical staff that plaintiff should catheterize himself to manage his condition. As the doctor explained:

> I would like him to begin catheterizing much more frequently to
> try to achieve catheterized volumes of 500 ml or less. This may

> mean that the patient will need to catheterize every 2-3 hours, at least initially. If he is unable to accommodate this at the facility, then an indwelling Foley catheter should be placed for 1 month's time, at which point it could be removed and new attempts at straight catheterization with a decompressed bladder could be attempted. For now, he should continue with either straight catheterization to achieve catheterized volumes of less than 500 ml at a time for several months or have an indwelling Foley placed, as mentioned previously, with resumption of straight catheterizing after 1 month's time.

Dkt. 127-4, at 81. Within three days of the appointment, Dr. Cox entered an order that plaintiff was to use a straight catheter seven to eight times a day and have a follow-up appointment at UW Hospital in six months. Doctors at UW Hospital eventually diagnosed plaintiff with a neurogenic bladder, which is a dysfunction of the urinary bladder that occurs because of central nervous system disease or because of disease in the nerves that control urination. Most patients with the condition must use catheters to pass urine.

On October 8, 2005, plaintiff had his first confrontation with prison staff concerning his catheterization. At about 11:00 a.m., Nurse Waterman received a call from a correctional officer on plaintiff's unit. The officer informed Nurse Waterman that plaintiff had refused his catheter supplies twice that morning and three times the day before. Nurse Waterman went to plaintiff's cell and provided him with a DOC form to confirm that he was refusing recommended treatment. The form explained the risks of refusing to catheterize, including bacterial infection, abdominal pain, and sepsis. Plaintiff waved Nurse Waterman away (it does not appear that he signed the refusal form). Nurse Waterman noted in plaintiff's medical records that she would have Dr. Cox review plaintiff's refusal.

The next morning, Nurse Waterman received another call from a correctional officer informing her that plaintiff had again refused his catheter kit. There is some dispute about

4

what happened next. Nurse Waterman contends that she noted plaintiff's non-compliance and indicated that he should review the August 2005 letter from doctors at UW Hospital. Plaintiff disputes this, alleging that Nurse Waterman came to his cell, gave him a copy of the letter from UW Hospital, and told him that he would be forced to wear an indwelling Foley catheter. The parties' dispute is immaterial because even accepting plaintiff's version of events as true, he was not forced to switch to an indwelling catheter. Indeed, medical records confirm that plaintiff continued using straight catheters for the next several months.

In February 2006, plaintiff underwent surgery at UW Hospital to repair a rectal prolapse. Plaintiff was hospitalized for three days, and during that time, doctors gave him a Foley catheter. This type of catheter stays in place and is connected to a drainage bag that can be changed without changing the catheter. When UW Hospital discharged plaintiff, his doctors instructed that he could return to using straight catheters as needed. Upon plaintiff's return to WSPF, Dr. Cox wrote an order for him to continue using straight catheters.

The day after plaintiff's discharge, he submitted a health service request for a Foley catheter. Plaintiff wrote that:

> I am in so much pain I am requesting to wear the catheter that stays in because when I use the straight catheter this is causing unreal pain. Plus at the UW Hospital I felt no discomfort with the catheter staying in. Plus I want [sic] have to use the catheter, I don't really have much say into what goes on I am requesting to wear the catheter, because of too many infections and way too much pain and keeping my life out of danger. I need to speak to Doctor Cox or Cindy Sawinski A.S.A.P.

Dkt. 127-1, at 232. Dr. Cox saw plaintiff two days later and approved his request for a Foley catheter, to be changed weekly. The day after that, plaintiff visited the HSU and medical personnel inserted the Foley catheter, showed plaintiff how to change the discharge bag

5

(which the parties sometimes refer to as a "leg bag"), and instructed him to contact the HSU if he had any problems. The HSU manager sent a memo to WSPF staff explaining that plaintiff would be wearing a Foley catheter, and that medical staff would change the catheter every week while plaintiff would change his discharge bags daily, by himself.

During April 2006, plaintiff went back and forth between wanting a Foley catheter and wanting straight catheters. On April 6, at plaintiff's request, Dr. Cox wrote an order allowing him to use straight catheters seven to eight times per day, as needed. But less than two weeks later, plaintiff requested to switch back to a Foley catheter. Dr. Cox approved the request on April 17. Plaintiff did not request any more changes after April 2006.

Beginning in 2011, Dr. Cox ordered that plaintiff could take Vicodin one hour before changing his Foley catheter (i.e., once a week). Dr. Cox did not feel that Vicodin was medically necessary; in his experience, most patients who routinely changed their catheters did not require any pain medication. But he prescribed it anyway, based on plaintiff's complaints of pain. Every six months, Dr. Cox reviewed and renewed his orders for Vicodin. He issued the most recent order in November 2012, and it was valid through April 2013.

Although plaintiff's bladder condition and difficulties with catheterization continued, he also had an isolated medical incident in May and June 2012. On May 28, plaintiff submitted a health service request for a urine test because he was worried that he had an infection. The HSU did not receive this request until June 1. But plaintiff submitted a second request two days after submitting his first request. The HSU received plaintiff's second request on May 31. That same day, Nurse Kinyon responded to the second request. Plaintiff refused to come out of his cell, agreeing only to provide a urine sample. Nurse Kinyon noted that plaintiff did not display obvious signs of distress. The results of plaintiff's urine test

came back positive for an infection. Dr. Cox prescribed Ciprofloxacin (Cipro), an antibiotic, to treat the infection pending the results of a sensitivity report. Nurse Kinyon informed plaintiff of the prescription, and he began taking the antibiotics.

A few days later, the sensitivity report indicated that plaintiff's infection was resistant to Cipro. On June 4, Dr. Cox changed plaintiff's prescription to Levofloxacin, a different antibiotic. After entering the order, Dr. Cox had no further involvement in treating plaintiff's infection. Despite the order changing plaintiff's medication, unidentified staff members at WSPF accidentally sent plaintiff Cipro and Levofloxacin on June 5. Nurses Waterman and Kinyon were not involved in sending the medication to plaintiff.[1]

Plaintiff ended up taking both antibiotics. He alleges that afterward, he "became very sleepy, and even after I had gone to sleep and awaken I still felt sleepy and strange like I wasn't myself." Dkt. 24, ¶ 5. Plaintiff submitted a health service request on June 5, and Nurse Waterman received the request the next day. Nurse Waterman went to plaintiff's cell

---

[1] Plaintiff contends that Nurses Waterman and Kinyon *were* involved. But the evidence that he contends creates a dispute is his own declaration, which is difficult to understand. He states that "[a]ccording to Sgt. Brinkman who return and said Nurse Shinyon [sic] said Dr. Cox said take both until they are all gone. Nurses Waterman and Shinyon [sic] said not to take both meds send Cipro back." Dkt. 164, ¶ 21. If plaintiff means that Sergeant Brinkman—who is not a party to this case—told him what Nurse Kinyon and Dr. Cox said, then the evidence is inadmissible hearsay: plaintiff cannot rely on Sergeant Brinkman's out of court statements to prove the truth of what Sergeant Brinkman said. Fed. R. Evid. 801 and 802; *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) ("A party may not rely upon inadmissible hearsay to oppose a motion for summary judgment."). If plaintiff means that Nurses Waterman and Kinyon actually told Sergeant Brinkman to tell plaintiff to not take both antibiotics but that Sergeant Brinkman lied to him, then plaintiff's statement is inadmissible because he has not explained how he has personal knowledge of what the nurses actually said to Sergeant Brinkman. Fed. R. Evid. 602. Either way, plaintiff has not genuinely disputed that Nurses Waterman and Kinyon were not involved in sending him both antibiotics.

and took away the Cipro because it had been discontinued. At that time, plaintiff did not complain to Nurse Waterman about any side effects of taking both medications.

Plaintiff's next confrontation with WSPF staff occurred on January 1, 2013. The parties dispute what exactly happened. According to plaintiff, his catheter had come out, and so he asked Sergeant Matti to contact a nurse. But Sergeant Matti refused to do so, causing plaintiff to suffer severe pain and stomach cramps. For his part, Sergeant Matti does not remember plaintiff asking to see medical staff on January 1, nor does he remember plaintiff making any statements about his catheter coming out.[2]

Plaintiff was transferred to CCI later in January 2013. He underwent an intake screening on January 17, and Dr. Suliene saw him a few days later to assess his condition and discuss his medical issues, including his catheter needs. Dr. Suliene noted that plaintiff had been using a Foley catheter for six to seven years. She wrote orders allowing plaintiff to continue using the Foley catheter and to change it monthly. Dr. Suliene did not change the existing orders for pain medication before catheter changes. Plaintiff contends that he told Dr. Suliene that he wanted to switch back to using straight catheters. Dr. Suliene disputes that plaintiff ever mentioned straight catheters.[3]

With Dr. Suliene's order in place, HSU Manager Anderson informed nursing staff that she wanted plaintiff's first catheter change at CCI to be supervised, to ensure that he was using proper technique. Consistent with this instruction, nursing staff called plaintiff to the

---

[2] This dispute is immaterial. As explained below, plaintiff has not exhausted his administrative remedies for his claims against Sergeant Matti. Thus, as a matter of law, even if the events occurred as plaintiff alleges that they did, he cannot succeed on his claims against Sergeant Matti.

[3] This dispute is immaterial because plaintiff has not exhausted his administrative remedies for his claim that Dr. Suliene forced him to keep using a Foley catheter.

HSU on February 1, 2013, to observe his catheter change. Plaintiff refused to change his catheter, explaining that he did not want to be observed and that he wanted to be able to change his catheter on his own. Plaintiff also demanded Vicodin for his catheter change. But a nurse responded that plaintiff did not have a doctor's order for Vicodin on file. Plaintiff left the HSU without changing his catheter.

The state defendants do not dispute that plaintiff actually had a valid order for Vicodin in February 2013—Dr. Cox's November 2012 order was still in effect. But the medical personnel who interacted with plaintiff between February and May 2013 did not see Dr. Cox's order because of a recordkeeping error.

Over the next several months, plaintiff essentially went through the same routine each month: he would get called to the HSU, nurses would ask him to change his catheter so that they could ensure that he was using proper technique, plaintiff would refuse to do so, and nurses would provide him with a new leg bag and let him return to his cell.

On May 1, 2013, plaintiff saw Nurse Campbell for a catheter change, and he asked for Vicodin. She checked plaintiff's medical records and determined that he did not have a current prescription for Vicodin (by this time, Dr. Cox's order had expired). Nurse Campbell contacted another nurse, who authorized her to offer plaintiff lidocaine jelly. Plaintiff refused the lidocaine jelly and refused to change his catheter. Nurse Campbell provided him with a leg bag, and he returned to his cell.

On June 3, 2013, plaintiff saw Nurse Thorne for a catheter change. Plaintiff explained that he usually received two Vicodin tabs before changing his catheter and that he had previously been allowed to change his catheter in his cell. Nurse Thorne reviewed plaintiff's medical records, concluded that he did not have a current prescription for Vicodin, and saw

that he had not yet completed a catheter change under supervision while at CCI. Plaintiff again refused to change his catheter.

A week later, Dr. Martin—who was assisting at CCI at the time but who was not the institution's primary physician—ordered supplies for plaintiff to change his catheter. Dr. Martin also wrote plaintiff a prescription for Vicodin. According to Dr. Martin, he ordered the Vicodin because "it was a chronic routine for [plaintiff]." Dkt. 133, ¶ 14. On June 11, 2013, plaintiff returned to the HSU, where Nurse Newman gave him two Vicodin tablets and observed him successfully change his catheter without complaints. Nurse Newman gave plaintiff two leg bags, and he returned to his cell.

Unfortunately, the next month did not go as smoothly. Plaintiff went to the HSU on July 1, 2013, and Nurse Spannagel offered him Vicodin and a private exam room in which to change his catheter. But for security reasons, Nurse Spannagel could not leave the exam room because it contained medical equipment. He offered to not look directly at plaintiff, but plaintiff refused to change his catheter and went back to his cell. Because plaintiff had refused to take the Vicodin, Dr. Martin discontinued the prescription the next day. Two weeks later, plaintiff again refused to change his catheter after asking for Vicodin (which had been discontinued at that point).

On August 1, 2013, plaintiff went to the HSU for his catheter change. He asked for Vicodin and showed medical personnel documents from an Institution Complaint Examiner (ICE) stating that orders were in place for him to receive pain medication before changing his catheter. These documents were part of an inmate grievance that plaintiff had submitted in May 2013 to complain about not receiving Vicodin before catheter changes. In reviewing the grievance, the ICE had contacted HSU Manager Anderson, who explained that orders were in

10

place for plaintiff to receive Vicodin (she was referring to the order that Dr. Martin had entered on June 10, which had not been discontinued at the time that she responded to the ICE's inquiry). The ICE recounted HSU Manager Anderson's response and recommended dismissing plaintiff's grievance with modification. By August 1, when plaintiff showed this documentation to medical personnel, Dr. Martin had discontinued the prescription. Thus, they refused to give plaintiff Vicodin, and he left without changing his catheter. Two weeks later, plaintiff asked Nurse Campbell for Vicodin, which she could not provide because he did not have a current prescription for it. Plaintiff again refused to change his catheter.

On September 6, 2013, staff informed plaintiff that he had an appointment to change his catheter. When plaintiff arrived at the HSU, he asked to see a physician even though he had not been scheduled to see one. Based on the medical records, it does not appear that plaintiff saw a physician. He refused to change his catheter and returned to his cell.

On October 1, 2013, plaintiff saw Nurse Kerch in the HSU, in response to a health service request that plaintiff had submitted. Plaintiff asked who had changed his orders for pain medication, and Nurse Kerch responded that Dr. Martin had done so. Nurse Kerch noted that plaintiff's last catheter change took place in June 2013, but that plaintiff was refusing to change it again without Vicodin. Nurse Kerch offered plaintiff catheter supplies so that he could change his catheter on his own. Plaintiff refused the supplies. Nurse Kerch advised plaintiff that he should change his catheter.

On November 1, 2013, plaintiff saw Nurse Thorne in the HSU. She asked him if he was going to change his catheter that day, and plaintiff was generally unresponsive. When plaintiff finally made eye contact with Nurse Thorne, he indicated that he was not going to change his catheter and left.

11

A week later, plaintiff saw Dr. Steliga, who is not a party to this lawsuit. Plaintiff reported that he ordinarily received Vicodin before changing his catheter and that he changed the catheter on his own. He refused to submit to an exam and did not change his catheter. Dr. Steliga wrote plaintiff an order for catheter supplies and for pre-change pain medication. But Dr. Steliga canceled the order for Vicodin later that day, noting that plaintiff had a history of taking Vicodin and then not changing his catheter.[4]

Plaintiff met with Nurses Anderson and Kerch to discuss how to proceed with his catheter changes. Plaintiff emphasized that he had done the changes himself at WSPF and that he wanted to do so at CCI. Nurses Anderson and Kerch informed plaintiff that he could change his catheter in the inmate bathroom, and they contacted a physician and received verbal consent to provide plaintiff with Vicodin that day. The physician also reviewed plaintiff's records and entered an order for plaintiff to receive Vicodin before future catheter changes. But plaintiff became agitated and left before receiving the Vicodin. Later that evening, Nurse Kerch went to plaintiff's cell, gave him Vicodin and catheter supplies, and told him that a nurse would come back in an hour to collect the old catheter supplies and a urine sample. About an hour later, Nurse Anderson returned to retrieve the old supplies. Plaintiff had successfully changed his catheter and he also provided a urine sample.

On December 6, 2013, plaintiff saw Dr. Heinzl.[5] Plaintiff reported that his catheter had come out the night before, and he asked Dr. Heinzl if he could use a balloon with 10cc

---

[4] Based on plaintiff's medical records, it is not clear what "history" Dr. Steliga meant. But because plaintiff is not bringing claims against her in this case, the issue is irrelevant.

[5] Plaintiff initially named Dr. Heinzl as a defendant in this case. *See* Dkt. 1. I have since dismissed Dr. Heinzl because plaintiff failed to exhaust his administrative remedies for the claims that he asserted against him. *See* Dkt. 107.

of fluid to keep the catheter from coming out. When Dr. Heinzl asked plaintiff if he wanted to switch back to using straight catheters, plaintiff was vague and did not give a straight answer. Plaintiff asked about keeping his catheter supplies in his cell and taking Vicodin before each change, but Dr. Heinzl responded that neither practice was medically necessary. Dr. Heinzl eventually entered an order allowing plaintiff to insert a Foley catheter with 10cc of fluid in the balloon. He did not change the existing order for Vicodin.

Plaintiff refused to attend his January 2014 appointment to change his catheter.

On March 10, 2014, plaintiff submitted a health service request indicating that his catheter had fallen out. Nurse Spannagel sent plaintiff a straight catheter as a temporary fix because the HSU was out of Foley catheters. Nurse Spannagel also scheduled plaintiff for an appointment with the HSU the next morning. Plaintiff sent the catheter back, indicating that it was the wrong type. Nurse Spannagel sent a message to plaintiff, through a correctional officer, explaining that the plan was for him to use a straight catheter until morning. Plaintiff responded that he was going to just reinsert his old Foley catheter. Nurse Spannagel instructed plaintiff to use swabs to clean out the catheter before trying to reinsert it.

The next day, Nurse Anderson went to plaintiff's cell and gave him the prescribed dose of Vicodin. When she returned an hour later, plaintiff had successfully changed his catheter in his cell, and he returned the old items to Nurse Anderson without incident.

On April 7, 2014, plaintiff came to the HSU for his monthly catheter change. Nurse Anderson gave him Vicodin and placed the new catheter supplies into a bag for the escorting officer to take back to plaintiff's cell. She wrote "controlled" on the bag because it contained supplies that could be used as weapons or for self-harm. But plaintiff contends that once he got back to his cell, correctional officers refused to give him the supplies. Two hours later,

Nurse Anderson went to plaintiff's cell to retrieve the old supplies. She had new supplies, which she offered to plaintiff. He refused them. Nurse Anderson told plaintiff to submit a health service request if he changed his mind, and then she left.

The next day, plaintiff submitted a health service request. Dr. Hoffmann responded to the request by indicating that he had discontinued plaintiff's prescription for Vicodin. According to Dr. Hoffmann, he discontinued the prescription because plaintiff had taken Vicodin the day before and then refused to change his catheter.

Plaintiff submitted two health service requests in May 2014. Nurse Peters-Anderson addressed these requests with plaintiff in the HSU on May 9. She conducted a urine test and determined that plaintiff had a urinary tract infection. Plaintiff complained to Nurse Peters-Anderson that he was not receiving Vicodin before his catheter changes. But she correctly responded that plaintiff did not have a valid prescription for Vicodin—Dr. Hoffmann had canceled it in April. Plaintiff also asked Nurse Peters-Anderson for a catheter kit, which the HSU did not have at the time. There is some dispute about whether Nurse Peters-Anderson put together catheter supplies and gave them to plaintiff right then, or whether she sent plaintiff back to his cell and then placed an order for someone else to deliver the supplies later. For purposes of summary judgment, I will accept plaintiff's version: Nurse Peters-Anderson put together some supplies during the exam and gave them to plaintiff. Regardless of how and when plaintiff received the supplies, he contends that they did not include an empty syringe, which he needed to change his catheter.

Two days later, plaintiff approached Nurse Drafahl and asked her for gloves and a syringe. The exchange did not occur in the HSU—it happened while Nurse Drafahl was

passing out medication during breakfast. Nurse Drafahl responded that CCI did not give inmates gloves and syringes.

The next month, plaintiff resumed his pattern of refusing to change his catheter despite staff offering him new supplies. The problems persisted until August 2014, when plaintiff saw Dr. Hoffmann. Plaintiff wanted to know why Dr. Hoffmann had canceled the order for Vicodin without ever examining him and why the procedures that plaintiff had used at WSPF had not continued when he was transferred to CCI. Dr. Hoffmann explained that his decision was based on plaintiff taking Vicodin and then refusing to change his catheter in April 2014, and he also explained that prisoners' medical procedures did not necessarily continue when they changed institutions. At that point, plaintiff stood up, said "then we are through," and left.

On September 26, 2014, plaintiff came to the HSU and received supplies to change his catheter in his cell. Plaintiff and Nurse Thorne discussed whether plaintiff could have an extra kit in his cell, and they agreed to discuss the issue with the manager of the HSU.

Plaintiff filed suit on September 30, 2014. Dkt. 1. I granted him leave to proceed with claims under the First and Eighth Amendments and with medical malpractice claims under state law. Dkt. 10. I have subject matter jurisdiction over plaintiff's constitutional claims pursuant to 28 U.S.C. § 1331, because they arise under federal law, and I have subject matter jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. § 1367, because they are related to plaintiff's constitutional claims and form part of the same case or controversy.

ANALYSIS

In total, defendants have filed four motions for summary judgment. The state defendants move for summary judgment on some of plaintiff's claims because he failed to exhaust his administrative remedies. Dkt. 115. The state defendants also move for merits-based summary judgment on all of plaintiff's claims against them. Dkt. 124. Nurse Peters-Anderson moves for merits-based summary judgment on all of plaintiff's claims against her, Dkt. 119, and Nurse Drafahl moves for merits-based summary judgment on all of plaintiff's claims against her, Dkt. 198. Plaintiff opposes all four motions.

I will address the state defendants' exhaustion-based motion first. Then I will address all three merits-based motions together, discussing each of plaintiff's claims in turn. The end result will be that I will dismiss some of plaintiff's Eighth Amendment claims without prejudice because he failed to exhaust his administrative remedies for these claims. I will grant summary judgment to defendants on all remaining claims because plaintiff has not come forward with evidence that would support a reasonable jury verdict on these claims.[6]

## A.  The state defendants' exhaustion-based motion for summary judgment

Under the Prison Litigation Reform Act, "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has applied "the PLRA's exhaustion requirement . . . to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534

---

[6] The state defendants recently moved to stay all remaining deadlines until I resolved the pending motions for summary judgment. Dkt. 217. Given that this opinion will dispose of the case, I will deny the state defendants' motion as moot.

U.S. 516, 532 (2002) (internal citations omitted). To properly exhaust a claim, "the inmate must file a timely grievance utilizing the procedures and rules of the state's prison grievance process." *Maddox v. Love*, 655 F.3d 709, 720 (7th Cir. 2011). "[A] prisoner who does not properly take each step within the administrative process has failed to exhaust state remedies, and thus is foreclosed by § 1997e(a) from litigating." *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002). Failure to exhaust is an affirmative defense, which defendants have the burden of raising and proving. *Dale v. Lappin*, 376 F.3d 652, 655 (7th Cir. 2004).

The State of Wisconsin makes administrative remedies available to inmates through the Inmate Complaint Review System, a four-part process. Under this system, an inmate must file a grievance within 14 calendar days after the relevant events occur. Wis. Admin. Code DOC § 310.09(6). An ICE reviews the grievance and recommends action to a reviewing authority. *Id.* § 310.11(4), (11). The reviewing authority makes a decision within 10 working days. *Id.* § 310.12. If an inmate is not satisfied with the reviewing authority's decision, then he may appeal that decision to the Corrections Complaint Examiner (CCE), who makes a recommendation to the office of the secretary, which ultimately accepts, rejects, or returns the recommendation to the CCE. *Id.* §§ 310.13-.14.

Defendants Dr. Cox, Nurse Waterman, Dr. Suliene, and Sergeant Matti move for summary judgment on some of plaintiff's claims against them, contending that he failed to exhaust his administrative remedies for these claims. Dkt. 115.[7] I will grant this motion.

---

[7] Plaintiff objects to the state defendants' motion as untimely. *See* Dkt. 40, at 4 (setting a deadline of July 24, 2015). But I gave the state defendants permission to file an untimely motion because the complexity of the case made their failure to notice an exhaustion issue understandable and because Seventh Circuit precedent directs district courts to avoid considering the merits of claims that have not been exhausted. Dkt. 146, at 2.

I granted plaintiff leave to proceed against Dr. Cox, Nurse Waterman, Dr. Suliene, and Sergeant Matti with claims under the Eighth Amendment. Dkt. 10, at 13-14. Specifically, I concluded that plaintiff had stated claims against Dr. Cox, Nurse Waterman, and Dr. Suliene for deliberate indifference to plaintiff's serious medical needs because they contravened the orders of UW Hospital doctors and forced him to wear a Foley catheter. *Id.* at 8.[8] I also concluded that plaintiff had stated a claim against Sergeant Matti for deliberate indifference because he refused to contact a nurse in January 2013, when plaintiff showed him that his catheter had come out. *Id.*

Plaintiff contends that he exhausted his claims against Dr. Cox, Nurse Waterman, and Dr. Suliene in inmate complaints WSPF-2005-27150 and CCI-2013-9917. Dkt. 156, at 1. But neither grievance mentioned that medical personnel had switched plaintiff from a straight catheter to a Foley catheter. For the '27150 grievance, this makes sense because plaintiff submitted the grievance on September 5, 2005, a month before Nurse Waterman (who was allegedly following Dr. Cox's orders) allegedly forced plaintiff to switch to a Foley catheter. *See* Dkt. 1, ¶ 32 ("[Waterman] told me on 10-9-05 to cath myself 8 x daily is way too much. This is the beginning of []DOC medical forcing me to wear a Foley catheter."). Thus, the '27150 grievance did not exhaust plaintiff's administrative remedies for his claims against Dr. Cox, Nurse Waterman, and Dr. Suliene.

In the '9917 grievance, plaintiff addressed "[o]ne issue: violation of doctor's orders. I explain to several nurses at CCI that I get pain meds before I cath myself doctor's order and that I been catheterizing myself since 2005. Dr. Suliene knew all this!" Dkt. 157-1, at 1.

---

[8] I also granted plaintiff leave to proceed against Dr. Suliene with a claim under the Eighth Amendment for failing to provide him with pain medication. Dkt. 10, at 8. That claim is not at issue in the state defendants' exhaustion-based motion for summary judgment.

Dr. Cox and Nurse Waterman worked at WSPF, and this grievance did not mention them other than to indicate that they had information about plaintiff's complaints. As for Dr. Suliene, plaintiff complained that she and other medical staff were not giving him pain medication before each catheter change, not that they were disobeying a doctor's orders regarding the type of catheter that plaintiff was supposed to use. Although an inmate does not need to lay out a detailed factual narrative, articulate legal theories, or demand particular relief to exhaust his administrative remedies, he must "object intelligibly to some asserted shortcoming." *Strong v. David*, 297 F.3d 646, 650 (7th Cir. 2002). "[T]he standard is whether the offender complaint would put an official on notice of the plaintiff's claim." *Wille v. Pugh*, No. 13-cv-1024, 2015 WL 5254532, at *6 (E.D. Wis. Sept. 9, 2015). Here, the '9917 grievance objected to CCI staff refusing to provide plaintiff with pain medication, not to their decision to keep plaintiff on a Foley catheter. Thus, the grievance did not exhaust plaintiff's administrative remedies for his claims against Dr. Cox, Nurse Waterman, or Dr. Suliene.

Plaintiff contends that he exhausted his administrative remedies for his claim against Sergeant Matti in inmate grievance WSPF-2006-38. But plaintiff submitted this grievance in January 2006, and the incident with Sergeant Matti that gives rise to plaintiff's claim against him occurred in January 2013. Thus, the '38 grievance could not have exhausted plaintiff's administrative remedies for his claim against Sergeant Matti.

Based on the analysis above, I conclude that plaintiff has failed to exhaust his administrative remedies for his claims that: (1) Dr. Cox, Nurse Waterman, and Dr. Suliene violated plaintiff's Eighth Amendment rights when they contravened the orders of UW Hospital doctors by forcing plaintiff to wear a Foley catheter; and (2) Sergeant Matti violated plaintiff's Eighth Amendment rights when he refused to contact a nurse in January 2013 after

19

seeing that plaintiff's catheter had come out. I will therefore grant the state defendants' motion for summary judgment on exhaustion grounds and dismiss these claims without prejudice. *See Teal v. Potter*, 559 F.3d 687, 693 (7th Cir. 2009). Although the dismissal is technically without prejudice, it is unlikely that plaintiff will ever be able to exhaust his administrative remedies for these claims.

## B. Defendants' merits-based motions for summary judgment

All defendants have moved for summary judgment on plaintiff's claims against them.[9] To succeed on their motions, defendants must show that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692 (7th Cir. 2005). I must draw all reasonable inferences from the facts in the summary judgment record in the nonmoving party's favor. *Baron v. City of Highland Park*, 195 F.3d 333, 338 (7th Cir. 1999). But if the nonmoving party fails to establish the existence of an essential element on which that party will bear the burden of proof at trial, then summary judgment for the moving party is proper. *Celotex*, 477 U.S. at 322.

### 1. Eighth Amendment claims

I granted plaintiff leave to proceed with the following Eighth Amendment claims for deliberate indifference to his serious medical needs:

---

[9] I will not address the merits of plaintiff's Eighth Amendment claims against Dr. Cox, Nurse Waterman, or Sergeant Matti, as I dismissed these claims without prejudice. Likewise, I will not discuss plaintiff's Eighth Amendment claim against Dr. Suliene that arises out of her forcing plaintiff to wear a Foley catheter.

- Dr. Suliene failed to provide plaintiff with pain medication;

- HSU Manager Anderson and Nurses Campbell, Spannagel, Newman, Thorne, Anderson, Kerch, Peters-Anderson, and Drafahl recorded false progress notes, denied plaintiff Vicodin, and failed to provide plaintiff with necessary medical supplies; and

- Dr. Martin and Dr. Hoffmann removed plaintiff's prescription for Vicodin and failed to provide him with other pain relief.

Dkt. 10, at 8. These claims are part of plaintiff's principal theory for this case: he contends that at all relevant times, he was entitled to change his catheter in his cell, whenever he wanted to change it, and that he was entitled to receive Vicodin beforehand.

"[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain . . . proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (citations and internal quotation marks omitted). To succeed on his Eighth Amendment claims, plaintiff must "demonstrate two elements: 1) an objectively serious medical condition; and 2) an official's deliberate indifference to that condition." *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). For the first element of plaintiff's Eighth Amendment claims, "[a] medical need is considered sufficiently serious if the inmate's condition has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would perceive the need for a doctor's attention." *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (citations, internal quotation marks, and alterations omitted). Plaintiff's neurogenic bladder condition qualifies as a serious medical need. Doctors at UW Hospital diagnosed the condition and directed him to use a catheter to pass urine. Medical personnel cooperated with plaintiff's treatment plan by ordering catheter supplies and, on occasion, narcotic pain medication.

21

For the second element of plaintiff's Eighth Amendment claims, he "must establish that prison officials acted with a 'sufficiently culpable state of mind.'" *Id.* (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). Plaintiff does not need to establish that defendants intended to harm him, but negligence or accident is insufficient. *Id.* "It is enough to show that the defendants knew of a substantial risk of harm to [plaintiff] and disregarded the risk." *Id.* (alterations omitted). Based on the undisputed facts in the record, I conclude that plaintiff is not able to establish this element.

Plaintiff contends that different defendants provided inadequate care in different ways. The doctors refused to prescribe, or removed his prescription for, Vicodin. The nurses refused to provide Vicodin, lied in plaintiff's progress notes, and failed to provide the catheter supplies that plaintiff wanted when he wanted them. Although these allegations describe separate aspects of plaintiff's concerns with the medical care that he has received, I "must examine the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to his serious medical needs." *Reed v. McBride*, 178 F.3d 849, 855 (7th Cir. 1999) (citations and internal quotation marks omitted).

Since 2005, doctors have treated plaintiff's condition by directing him to use a catheter to pass urine. Medical personnel have also consistently offered pain relief, sometimes by prescribing Vicodin, and other times by offering lidocaine jelly. Plaintiff has also had access to Tylenol and other pain medication. Plaintiff does not contend that this general course of treatment was inadequate; rather, he is challenging specific instances where prison medical personnel did not provide the treatment that he wanted in the way that he wanted it. Some of these instances involved doctors switching plaintiff to a Foley catheter.[10] Other

---

[10] As explained above, defendants are entitled to summary judgment on these claims because

instances involved doctors making medical judgments about plaintiff's condition or nurses providing the care that doctors had ordered. Plaintiff may disagree with his doctors' orders and his nurses' decisions to follow those orders, but "[n]either medical malpractice nor mere disagreement with a doctor's medical judgment is enough to prove deliberate indifference in violation of the Eighth Amendment." *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010).

Plaintiff has not adduced evidence of a single time that he was denied catheter supplies outright during the nine years that are at issue in this case. Two incidents come close, but neither establishes that any defendants were deliberately indifferent to, or otherwise failed to treat, plaintiff's medical needs.

First, in April 2014, plaintiff went to the HSU at CCI, received Vicodin, and then returned to his cell to change his catheter. Nurse Anderson placed plaintiff's catheter supplies in a bag, wrote "controlled" on the bag, and gave it to the correctional officer who was escorting plaintiff. Plaintiff alleges that correctional officers (who are not defendants in this case) later refused to give him the supplies when he asked for them. But there is no dispute that Nurse Anderson came to his cell a few hours later and offered him catheter supplies, which he refused. At most, plaintiff's treatment was delayed by a few hours. This delay does not constitute deliberate indifference to plaintiff's medical needs.

Second, in May 2014, Nurse Peters-Anderson put together some supplies for plaintiff because the HSU was out of catheter kits. The supplies did not include an empty syringe. Although plaintiff contends that he could not change his catheter without the syringe, he has

---

plaintiff failed to exhaust his administrative remedies. But even if I were to consider the merits of these claims, the evidence establishes that doctors switched plaintiff to a Foley catheter only because *he asked to be switched*. And doctors continued accommodating plaintiff by switching him back to a straight catheter, and then back again to a Foley catheter. This was not deliberate indifference—it was medical treatment that plaintiff requested.

not adduced evidence that he told Nurse Peters-Anderson about the issue or that she knew that the supplies were incomplete. As for plaintiff's interaction with Nurse Drafahl a few days later, there is no evidence that: (1) she knew that the supplies that Nurse Peters-Anderson had assembled were incomplete and that plaintiff actually needed the missing items; or (2) she had the supplies on hand and could have given them to plaintiff. Regardless, plaintiff received a full set of supplies a few weeks later. It is not clear that it would have made a difference if plaintiff had received the missing supplies from Nurses Peters-Anderson or Drafahl because by May 2014, plaintiff had already informed CCI staff members that he was not changing his catheter because they were withholding Vicodin. Dkt. 127-2, at 18.

Even construing the facts in plaintiff's favor, it appears that Nurse Peters-Anderson did the best that she could with the supplies available. Plaintiff was not in the HSU for a catheter change, and so there was no reason for Nurse Peters-Anderson to be prepared to address this particular medical concern. Likewise, Nurse Drafahl denied plaintiff's request during a chance encounter outside the HSU, as she was passing out medication to other inmates. The evidence also demonstrates that other medical personnel tried to give plaintiff catheter supplies in May 2014 and that he rejected those supplies because they did not come with Vicodin. Under the circumstances, no reasonable jury could conclude that Nurses Peters-Anderson or Drafahl were deliberately indifferent to plaintiff's medical needs.

Plaintiff's next category of challenges relates to his pre-procedure Vicodin. Defendants acknowledge that plaintiff had a valid prescription in effect in February, March, and April of 2013. Dkt. 125, at 29-30. During these three months, plaintiff had contact with Dr. Suliene and Nurse Campbell. Dr. Suliene never denied plaintiff Vicodin—she left Dr. Cox's order for Vicodin in place. Nurse Campbell refused to provide plaintiff with Vicodin on two occasions

24

because she did not see Dr. Cox's order in his medical records. Dkt. 139, ¶ 7. This was an unfortunate mix-up, but it was not a constitutional violation. There is no evidence that Nurse Campbell knew of Dr. Cox's order and then intentionally refused to comply with it. *Cf. Walker v. Benjamin*, 293 F.3d 1030, 1040 (7th Cir. 2002) (concluding that defendants did not have qualified immunity when there was evidence that the plaintiff's "doctor prescribed pain medication, and Nurse Dunbar simply refused to give it to him," which would violate the Eighth Amendment). Although Nurse Campbell overlooked plaintiff's prescription for Vicodin, she still offered plaintiff the primary treatment for his condition: catheter supplies. Every other time that plaintiff requested Vicodin and had a valid prescription, he received it. And every other time that nurses denied plaintiff Vicodin, it was because he did not have a valid prescription for it (and nurses were not allowed to independently prescribe Vicodin).[11] Medical personnel routinely offered plaintiff lidocaine jelly and other medication for pain management. Under these circumstances, no reasonable jury could find that defendants were deliberately indifferent to plaintiff's medical needs.

Each time that doctors canceled plaintiff's prescription for Vicodin, they had valid reasons for doing so. After plaintiff refused to take Vicodin and change his catheter in July 2013, Dr. Martin canceled plaintiff's prescription because he felt that it was no longer necessary. According to Dr. Martin, most patients who routinely change their catheters do not require pain medication, and lidocaine jelly would have been an adequate way to manage

---

[11] In responding to plaintiff's requests to admit, Dr. Cox denied that "[o]nly a doctor can prescribe medication." Dkt. 162-4, at 26. From this admission, plaintiff contends that his nurses could have prescribed him Vicodin. But plaintiff misunderstands Dr. Cox's response. Just because doctors are not the only medical personnel who can prescribe medication does not mean that nurses *can* prescribe medication. The nurses in this case indicate that they did not have that authority, and plaintiff has not genuinely disputed this fact.

any pain associated with the change. Dkt. 133, ¶ 17. Plaintiff responds that he did not refuse to change his catheter in July 2013, and so Dr. Martin's real reason for canceling the prescription was retaliation (presumably, to punish plaintiff for filing inmate grievances about his medical care). But there is no dispute that plaintiff did not take his Vicodin or catheter supplies in July 2013. In Dr. Martin's opinion, this was a sufficient reason to discontinue plaintiff's prescription. Plaintiff's disagreement with the decision does not mean that Dr. Martin was deliberately indifferent to his medical condition. *Holloway v. Del. Cty. Sheriff*, 700 F.3d 1063, 1074 (7th Cir. 2012) ("[T]he prison physician, as the inmate's acting primary care doctor, is free to make his own, independent medical determination as to the necessity of certain treatments or medications, so long as the determination is based on the physician's professional judgment and does not go against accepted professional standards.").

After plaintiff took Vicodin and then refused to change his catheter in April 2014, Dr. Hoffmann canceled plaintiff's prescription. Plaintiff argues that he did not refuse to change his catheter; correctional officers refused to provide him with the supplies when he asked for them. But the undisputed facts confirm that Nurse Anderson came to plaintiff's cell and offered him supplies, which he refused. Plaintiff has not adduced evidence to suggest that Dr. Hoffmann did not believe Nurse Anderson's account of the relevant events. Based on that account, Dr. Hoffmann reasonably decided to discontinue plaintiff's prescription.

Plaintiff also contends that medical personnel lied in some of their entries in his medical records. Even assuming that false progress notes would violate the Eighth Amendment, plaintiff has failed to adduce any evidence to support his allegations. Most of the lies that plaintiff identified in his complaint relate to entries indicating that plaintiff refused treatment when nurses offered him catheter supplies. A recurring theme in plaintiff's

26

submissions is that he could not technically "refuse" supplies because doctors at UW Hospital initially ordered him to change his catheter "as needed." But by the time that plaintiff arrived at CCI, those orders were seven years old. Medical personnel at CCI were operating under Dr. Suliene's more recent order that plaintiff replace his Foley catheter once a month, not "as needed." And even if plaintiff was entitled to receive supplies as needed, nurses did not lie when they reported that plaintiff refused catheter supplies by not accepting them when they were offered to him—that is what "refuse" means.

In response to defendants' motions for summary judgment, plaintiff has identified only four specific lies that he contends violated his Eighth Amendment rights. Plaintiff has therefore waived opposition to defendants' motions as they pertain to the other lies alleged in the complaint. *Walton v. U.S. Steel Corp.*, 497 F. App'x 651, 655 (7th Cir. 2012); *Laborers' Int'l Union of N. Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999). The lies that plaintiff addresses include: (1) Nurse Spannagel lied about offering plaintiff catheter supplies in March 2014, Dkt. 161, at 6; (2) Nurse Anderson lied about plaintiff refusing to change his catheter in April 2014, *id.*; (3) Nurse Thorne lied about sending plaintiff catheter supplies in May 2014, *id.*; and (4) Nurses Campbell and Anderson lied about plaintiff's history of taking Vicodin and not catheterizing himself, *id.* at 5, 8. But plaintiff has failed to adduce evidence that the nurses actually lied—he either misreads or misunderstands the relevant progress notes. For example, Nurses Campbell and Anderson did not lie about plaintiff's history: on at least one occasion, plaintiff *did* take Vicodin and then refuse to change his catheter.

Plaintiff's Eighth Amendment claims essentially boil down to his desire to manage his bladder condition as he sees fit. He wants to receive Vicodin before each catheter change and he wants to change his catheter in his cell whenever he wants. Over the past 10 years, doctors

27

and other medical personnel sometimes accommodated plaintiff. Sometimes they did not accommodate him. But defendants were not deliberately indifferent to plaintiff's serious medical needs: they consistently responded to his requests for care and provided him with treatment. Because plaintiff cannot establish the second element of his Eighth Amendment claims, I will grant defendants' motions for summary judgment.

### 2.  First Amendment claims

I granted plaintiff leave to proceed with First Amendment claims for retaliation against defendants Dr. Martin and Nurses Campbell, Spannagel, Newman, Thorne, Anderson, and Kerch. Dkt. 10, at 10. Plaintiff's retaliation claims arise out of his allegations that these defendants withheld pain medication and catheter supplies in response to plaintiff's inmate grievances regarding their treatment. To succeed on these claims, plaintiff must demonstrate that "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in the [d]efendants' decision to take the retaliatory action." *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009) (internal citations and quotation marks omitted).

Plaintiff engaged in protected activity by filing inmate grievances complaining about the medical care that he was receiving. *See DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000) ("[A] prison official may not retaliate against a prisoner because that prisoner filed a grievance."). But defendants contend that plaintiff did not suffer an adverse action, and that even if he did, there is no evidence that plaintiff's grievances motivated those actions. For the most part, plaintiff does not respond to these arguments in opposing summary judgment. *See generally* Dkt. 161. He has therefore waived his opposition. *Walton*, 497 F. App'x at 655;

*Laborers' Int'l Union of N. Am.*, 197 F.3d at 1197. But even on the merits, I agree with defendants that they are entitled to summary judgment on plaintiff's retaliation claims because he has not adduced evidence of a causal connection between his protected activity and their adverse actions.

From plaintiff's summary judgment submissions (and from the allegations in the complaint), he appears to allege that the following events were retaliatory:

- In July 2013, Nurses Campbell, Spannagel, Newman, and Thorne said something to Dr. Martin to convince him to discontinue plaintiff's prescription for Vicodin. Then they recorded false progress notes to indicate that plaintiff had refused his catheter supplies. Dkt. 1, ¶¶ 51-53 and Dkt. 161, at 5.

- Nurses Spannagel, Campbell, Kerch, and Thorne refused to give plaintiff Vicodin from July 2013 to November 2013. And the nurses convinced Dr. Heinzl to cancel plaintiff's prescription for Vicodin. Dkt. 1, ¶ 55 and Dkt. 161, at 5.

- Nurse Anderson wrote "controlled" on the bag of catheter supplies that she sent with plaintiff in April 2014 because she knew that correctional officers would not give the supplies to plaintiff and that she could "set up" plaintiff for refusing his catheter supplies. Dkt. 1, ¶¶ 74-75 and Dkt. 161, at 6.

- In April 2014, Nurses Anderson, Campbell, Newman, Thorne, and Spannagel encouraged Dr. Hoffmann to discontinue plaintiff's prescription for Vicodin. Dkt. 161, at 6.

Based on the summary judgment evidence, the events listed above did not happen exactly as plaintiff has described them. But the basics are undisputed: after plaintiff complained about his medical care, doctors discontinued his prescriptions for Vicodin. Under these circumstances, a jury could certainly conclude that defendants' actions would dissuade an inmate from filing additional grievances. *Cf. Rowe v. Gibson*, 798 F.3d 622, 631 (7th Cir. 2015) (plaintiff stated a retaliation claim when he alleged that medical personnel deprived

him of prescription medication to "make him think twice about bringing lawsuits about inadequate medical care" (internal quotation marks omitted)).

Although plaintiff has identified protected conduct and adverse actions, there is no evidence of a causal connection between the two. The Seventh Circuit has adopted a two-part test for analyzing causation in the context of First Amendment retaliation claims. A plaintiff must first make a prima facie showing of causation by demonstrating that "the defendant's conduct was a sufficient condition of the plaintiff's injury. The defendant can rebut, but only by showing that his conduct was not a necessary condition of the harm—the harm would have occurred anyway." *Greene v. Doruff,* 660 F.3d 975, 980 (7th Cir. 2011). If defendants show that they would have taken the allegedly retaliatory action anyway, plaintiff "must then demonstrate that the defendant's proffered reasons for the decision were pretextual and that retaliatory animus was the real reason for the decision." *Zellner v. Herrick,* 639 F.3d 371, 379 (7th Cir. 2011). "At the summary judgment stage, this means that a plaintiff must produce evidence upon which a rational finder of fact could infer that the defendant's proffered reason is a lie." *Id.* (citing *Vukadinovich v. Bd. of Sch. Trs.,* 278 F.3d 693, 699 (7th Cir. 2002)).

Plaintiff contends that the nurses at CCI were essentially on a mission to convince doctors to take away his prescription for Vicodin. At the pleading stage, these bare allegations were sufficient to state retaliation claims. But now we are at summary judgment, and plaintiff does not have any *evidence* that nurses lied to Dr. Martin or Dr. Hoffmann to trick them into discontinuing plaintiff's prescriptions. *See Sierra Club v. Franklin Cty. Power of Ill., LLC,* 546 F.3d 918, 925 (7th Cir. 2008) (To survive a defendant's motion for summary judgment . . . a plaintiff cannot rely on mere allegations but must support each element by specific facts via affidavits or other evidence."). As I have already concluded, the nurses did not lie when they

30

recorded progress notes indicating that plaintiff refused his catheter supplies—this is merely another result of plaintiff's mistaken belief that it was impossible for him to "refuse" supplies that he believed should have been offered on an "as needed" basis. Likewise, the evidence confirms that the nurses did not give plaintiff pain medication from July 2013 to November 2013 because he did not have a valid prescription for it.

As for Dr. Martin and Dr. Hoffmann, they have explained why they discontinued plaintiff's prescriptions for Vicodin in 2013 and 2014. Dr. Martin canceled the prescription because plaintiff had refused Vicodin and a catheter change, and so he felt that plaintiff no longer needed Vicodin. Dkt. 133, ¶ 15. Dr. Hoffmann canceled the prescription because plaintiff had taken Vicodin and then refused to change his catheter. Dkt. 134, ¶ 14. Plaintiff speculates that the real reasons for the doctors' actions were retaliatory animus or collusion with nurses at CCI who wanted to retaliate against him. But plaintiff has not adduced evidence to support his speculation. No reasonable jury could doubt that Dr. Martin and Dr. Hoffmann sincerely believed the reasons that they gave for their decisions.

This leaves plaintiff's allegation that Nurse Anderson "set it all up" in April 2014, when she wrote "controlled" on the bag of catheter supplies. Dkt. 161, at 6. Plaintiff contends that the supplies were not actually supposed to be controlled, relying on a medical staff member's response to an inmate grievance that plaintiff filed to address the issue. Dkt. 162-6, at 10 ("The item was not controlled, it was meant to be exchanged one for one."). Nurse Anderson explains that she wrote "controlled" because the supplies in the bag could have been used as weapons or for self-harm. Dkt. 138, ¶ 12. But even assuming that Nurse Anderson incorrectly wrote "controlled" on the bag, there is no dispute that she went to plaintiff's cell a few hours later and offered him catheter supplies, which he refused. Based

31

on these facts, no reasonable jury could conclude that Nurse Anderson was setting plaintiff up or falsely recording that he had refused to change his catheter.

Plaintiff has not adduced evidence of a causal connection between his protected activity and defendants' adverse actions. Thus, defendants are entitled to summary judgment on plaintiff's Frist Amendment retaliation claims.

### 3. Medical malpractice claims

I granted plaintiff leave to proceed with state law medical malpractice claims against defendants Dr. Cox, HSU Manager Miller, and Nurses Kinyon and Waterman. These claims arise out of plaintiff's allegations that defendants directed him to take two different antibiotics at the same time in 2012. Under Wisconsin law, "[a] claim for medical malpractice, as all claims for negligence, requires the following four elements: (1) a breach of (2) a duty owed (3) that results in (4) an injury or injuries, or damages." *Paul v. Skemp*, 2001 WI 42, ¶ 17, 242 Wis. 2d 507, 625 N.W.2d 860.

Defendants first contend that they are entitled to summary judgment because plaintiff does not have an expert witness who will establish the applicable standard of care. Dkt. 125, at 14 (citing *Carney-Hayes v. Nw. Wis. Home Care, Inc.*, 2005 WI 118, ¶ 37, 284 Wis. 2d 56, 699 N.W.2d 524 ("Medical malpractice cases require expert testimony to establish the standard of care.")). I will not grant defendants summary judgment on this ground. If this case turned on disputes about the level of care that plaintiff should have received, then I would appoint counsel to represent plaintiff and pursue an expert opinion on the issue. But I have not appointed counsel because this case comes down to a few basic non-medical facts. For example, plaintiff cannot succeed on his Eighth Amendment claims because the evidence confirms that defendants did not lie in their progress notes, regularly offered plaintiff

treatment for his bladder condition, and handled plaintiff's requests for Vicodin in accordance with orders from doctors who had valid reasons for their decisions. The same is true for plaintiff's medical malpractice claims: defendants are entitled to summary judgment for basic factual reasons.

Defendants also contend that plaintiff did not experience an "injury" from taking two antibiotics. They argue—without citing to supporting authority—that feeling sleepy and "like I wasn't myself" for a brief period of time does not legally qualify as an injury. *Id.* at 15. This argument is not persuasive. Plaintiff has adduced evidence that he suffered side effects from taking two antibiotics. His injuries were certainly minor. But a jury could reasonably conclude that plaintiff is entitled to at least modest compensation for those injuries. Thus, defendants' contention that plaintiff did not suffer an injury does not entitle them to summary judgment.

Despite rejecting some of defendants' arguments, I will still grant their motion for summary judgment. The evidence confirms that WSPF staff overlooked Dr. Cox's order changing plaintiff's prescription from Cipro to Levofloxacin. But it appears that plaintiff has identified the wrong defendants for this claim. Even assuming that plaintiff could establish the other elements of his medical malpractice claim, Dr. Cox, HSU Manager Miller, and Nurses Kinyon and Waterman were not the individuals who allegedly breached the applicable standard of care. These defendants are therefore entitled to summary judgment.

Dr. Cox was not involved in the situation beyond ordering a change in plaintiff's prescription. HSU Manager Miller did not get involved until after the incident occurred, when she responded to an ICE who was investigating an inmate grievance that plaintiff filed. Likewise, Nurses Kinyon and Waterman were not the staff members who overlooked that

33

Dr. Cox had changed plaintiff's prescription, nor did they prepare the medication for prison guards to distribute to plaintiff that day. Plaintiff initially alleged that at his request, prison guards contacted Nurse Kinyon and reported that she said that he was to take both antibiotics. *See* Dkt. 1, ¶ 3. But plaintiff has not adduced admissible evidence to support this allegation, and as the record stands at summary judgment, Nurses Kinyon and Waterman did not get involved until *after* plaintiff had taken the antibiotics.

Based on these facts, plaintiff cannot succeed on medical malpractice claims against Dr. Cox, HSU Manager Miller, and Nurses Kinyon and Waterman. These defendants are entitled to summary judgment.

## ORDER

IT IS ORDERED that:

1. Defendants Burton Cox, Jolinda Waterman, Dalia Suliene, and Richard Matti's motion for partial summary judgment on exhaustion grounds, Dkt. 115, is GRANTED. Plaintiff's Eighth Amendment claims against Burton Cox, Jolinda Waterman, and Richard Matti are DISMISSED without prejudice. Plaintiff's Eighth Amendment claim against Dalia Suliene, arising out of her forcing plaintiff to wear a Foley catheter in violation of the orders of doctors at UW Hospital, is DISMISSED without prejudice.

2. Defendant Ann Peters-Anderson's motion for summary judgment, Dkt. 119, is GRANTED.

3. Defendants Karen Anderson, Trisha Anderson, Kim Campbell, Burton Cox, Phillip Kerch, Sheryl Kinyon, Brad Martin, Richard Matti, Mary Miller, Natalie Newman, David Spannagel, Dalia Suliene, Melissa Thorne, and Jolinda Waterman's motion for summary judgment, Dkt. 124, is GRANTED in substantial part. The motion is DENIED as unnecessary with regard to plaintiff's unexhausted claims.

4. Defendant Rose Drafahl's motion for summary judgment, Dkt. 198, is GRANTED.

5. The state defendants' motion to stay all pretrial deadlines and the trial date pending resolution of summary judgment, Dkt. 217, is DENIED as moot.

6. The clerk of court is directed to enter judgment accordingly and close this case.

Entered June 23, 2016.

BY THE COURT:
/s/
_____

JAMES D. PETERSON
District Judge